UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x

ROWLAND A. RUPP,                                      Case No.: 1:26-cv-045 (MAD/PJE)

                    Plaintiff,                          **COMPLAINT**


    - v -


ALBANY LAW SCHOOL OF UNION UNIVERSITY

                Defendant.
--------------------------------------------------------------------x

       By and through his counsel, Rupp Pfalzgraf LLC, the plaintiff Rowland A. Rupp,

hereinafter "Mr. Rupp" or "Plaintiff," alleges as follows:


## <u>PRELIMINARY STATEMENT</u>

       1.     This action arises from Albany Law School's deliberate indifference to a

racially hostile educational environment created by a tenured professor, followed by the School's

racially discriminatory and retaliatory use of its disciplinary machinery to suppress inquiry into

that conduct and to protect both the professor and the institution from accountability.

       2.     On January 13, 2025, Plaintiff, a second-year law student at Albany Law

School, attended the first session of Professor Anthony Farley's International Children's Rights

course. At the outset of class, Professor Farley intentionally deactivated the classroom's audio

recording system and abandoned course instruction, launching instead into a hostile political and

racial monologue directed at white conservative students.

       3.     During this opening discussion, Professor Farley delivered remarks

bearing no relation to the course syllabus or learning objectives. He dismissed the September 11,

2001 terrorist attacks as unworthy of attention, asserting that the only "real" September 11

students should care about was the 1973 CIA-backed overthrow of Chile. He further declared that the Founding Fathers were "worse than Hitler" and "horrible people," equating the leaders of the American Revolution with one of history's most notorious figures.

4.     Professor Farley then turned explicitly to race and identity, making sweeping generalizations about conservatives and white people. He proclaimed that conservatives "hate everyone—blacks, women, gays," that they "hate black people," and that they seek to "conserve slavery," framing contemporary political identity as synonymous with racial animus, moral depravity, and support for historical oppression.

5.     Having framed his remarks in these racial terms, Professor Farley directed them at Plaintiff Rupp personally. After asking whether anyone in the class hunted and Plaintiff raised his hand, Professor Farley singled him out, remarking in front of the class, "Of course the guy with the hat hunts," and using Plaintiff's attire and lawful personal interests as markers of the racialized identity he had just condemned. Professor Farley then expanded this individualized targeting by describing "what conservatives look like—their appearance," referring to such individuals as "Daniel Boone" types and invoking frontier-era imagery of whiteness and ruggedness while directing his gaze toward Plaintiff, thereby publicly marking him as the embodiment of the group being denigrated.

6.     Professor Farley's racialized targeting of Plaintiff did not end with the classroom remarks. Later that same day, Professor Farley published a public post on his Facebook page in which he mocked Plaintiff's appearance, described him as having an "incel / MAGA look," referred to his "Daniel Boone" clothing and "Remember the Alamo" hat, and suggested that, in addition to racism, Plaintiff suffered from unspecified mental "illnesses." Published within hours of the class session and visible to thousands of readers, the post repeated

2

and amplified the same racialized stereotypes and mocking imagery Professor Farley had deployed in class.

7.      During the classroom incident, Plaintiff became visibly uncomfortable and humiliated by remarks that targeted him personally and ridiculed his appearance, race, and identity in front of his peers. After approximately thirty minutes of this abuse, when the insults turned intensely personal, Plaintiff gathered his belongings, approached the front of the classroom, briefly placed his hand on Professor Farley's shoulder in a non-threatening manner, stated in substance that he was leaving and would not be returning to the course, wished the professor good luck, and calmly left the classroom to drop the class and report Professor Farley's unprofessional conduct to Albany Law School administrators.

8.      The events of January 13, 2025 were not isolated or aberrational. For many years prior, Professor Farley had engaged in a well-known and unchecked pattern of conduct in which he used his classroom as a forum for racialized and ideological commentary, routinely abandoning course material to deliver extended monologues that framed political disagreement in racial terms and singled out white conservative students through abusive and racial stereotypes. Students who fit that profile were made to feel uncomfortable, targeted, and unwelcome, yet Professor Farley faced no discipline or corrective action from the School. Instead, Albany Law School administrators quietly warned some white conservative students not to enroll in his courses, effectively conceding the hostile environment while allowing it to continue. The same pattern extended beyond the classroom. When faculty members or administrators disagreed with Professor Farley on academic or institutional matters, he similarly racialized those disputes, aggressively accusing his colleagues of racism and invoking racial grievance as a means of silencing opposition. In both contexts—student instruction and faculty

governance—Professor Farley's racialized conduct was known to the administration and met not with accountability, but instead with tolerance and accommodation.

9.     Immediately after leaving the classroom on January 13, 2025, Plaintiff went to the School's administrative offices to drop the course and report Professor Farley's conduct to Albany Law School. Plaintiff was able to withdraw from the course that day, but the Associate Dean for Academic Affairs was unavailable to meet with him. Plaintiff therefore scheduled a meeting with the dean for early the following morning to lodge his complaint.

10.     During the remainder of morning, afternoon, and evening of January 13, 2025 — before he had any knowledge that Mr. Rupp planned to report his classroom behavior to the School — Professor Farley consistently described Mr. Rupp's departure from his classroom in non-violent terms. He communicated to School officials in writing that Plaintiff had been "disruptive" and requested that Plaintiff be removed from the class roster, but made no mention of having been assaulted. He also wrote about the incident on social media, characterizing Plaintiff's departure as theatrical ("the whole thing may well have been a Trumpist performance of some sort, who knows?") and stating that "all's well that ends well" because Plaintiff had already withdrawn from the course.   At no point in the more than 24 hours following the incident — before learning of Plaintiff's complaint — did Professor Farley allege that Plaintiff had assaulted him, struck him, or behaved violently in any way.

11.     The following morning, however, Plaintiff met with the Associate Dean for Academic Affairs and formally lodged his complaint against Professor Farley. Despite the confidential nature of the complaint process, the School immediately informed Professor Farley of Plaintiff's complaint.  Professor Farley responded by immediately initiating a retaliatory disciplinary complaint against Mr. Rupp, abandoning his earlier benign account and now

4

characterizing Plaintiff's departure from his classroom as an "assault" and a "crazy and racist scene," and asking — now more than 24 hours after the actual incident — that School security be notified and that Mr. Rupp be kept away from him.

12.     The handling of the two complaints by Albany Law School was not driven by a fair or impartial process but instead by a racialized, outcome-driven, and retaliatory campaign designed to silence a white student for standing up to a tenured black professor whose misbehavior the School was unwilling to confront. Albany Law School completely ignored Plaintiff's first-in-time complaint, giving Mr. Rupp a months-long runaround and shuffling him from administrator to administrator when he asked for updates on its status.  Ultimately, no investigation was initiated, no witnesses were interviewed, and no findings were made regarding Professor Farley's conduct before Mr. Rupp's complaint was unceremoniously dropped by the School over eight months after the January 13, 2025 incident.

13.     Meanwhile, Albany Law School proceeded vigorously with Professor Farley's retaliatory complaint, adopting and amplifying the professor's racial phrasing, and allowing him to co-opt and steer the disciplinary process along racial lines. In violation of its own policies, the School solicited and incorporated advocacy from the Black Law Students Association — an organization Professor Farley advises — and from senior DEI personnel, thereby converting Plaintiff's classroom departure into a narrative of a racially motivated assault. In doing so, the School wholeheartedly embraced Professor Farley's accusation that Plaintiff's conduct was itself racist, while simultaneously refusing to investigate Plaintiff's complaint of racial harassment by the professor.

14.     When Dean Jenean Taranto's initial inquiry and charge against Mr. Rupp under the Disciplinary Code failed to satisfy Professor Farley, he refused to cooperate with the

appointed investigator for nearly eight weeks until he succeeded in pressuring the School's administration, including Albany Law School Dean Cinnamon Carlarne, to escalate the allegations against Plaintiff outside of the process specified in the Disciplinary Code. Dean Taranto's original charge of "disrupting class" and briefly placing a hand on a professor's shoulder was thus converted into a fabricated and racialized accusation of violent misconduct.

15.     The procedure by which the School prosecuted the disciplinary charge against Mr. Rupp was outcome-driven, racialized, and retaliatory.  The School made no effort to comply with the terms of its own Disciplinary Code, repeatedly violating Mr. Rupp's due process rights by changing the charge without notice, opening a confidential disciplinary process to commentary from Farley-aligned student advocacy groups and a DEI dean, and determining Mr. Rupp's guilt in advance of the hearing he had requested. Along the way, the School repeatedly violated the law, including federal civil rights law.  In doing so, the School followed a familiar institutional practice: tolerating Professor Farley's racially abusive conduct and taking whatever steps were necessary to deflect scrutiny from that conduct, including sacrificing the student who complained.

16.     Through its actions and omissions, Albany Law School created and endorsed a racially hostile educational environment for white students and selectively enforced its Disciplinary Code in a racially discriminatory and retaliatory manner against Plaintiff Rupp. If the roles had been reversed, no student of color would have faced such a racially driven, outcome-oriented process nor had his guilt determined in part by the advocacy of student groups and a DEI dean aligned with a white professor.

17.     As a direct and proximate result of Defendant's conduct, Plaintiff has suffered significant educational, professional, and personal harm, including loss of scholarship

funds, disruption of his academic progress, reputational injury, and severe emotional distress. He brings this action to hold Albany Law School accountable for its violations of federal and state law.

## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) as this case involves violations of Mr. Rupp's rights under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., and 42 U.S.C. § 1981.

19.    Venue is proper in the Northern District of New York pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

20.    This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a).

## PARTIES

21.    Plaintiff, ROWLAND A. RUPP, is an individual citizen of the United States and a resident of the State of New York. At all times relevant to this complaint, he was a second-year student in good standing at Albany Law School.

22.    Defendant, ALBANY LAW SCHOOL OF UNION UNIVERSITY ("Albany Law School" or the "School"), is a private, not-for-profit educational institution located in Albany, New York.

23.     As a recipient of federal financial assistance, including but not limited to federal funds provided through Title IV of the Higher Education Act of 1965 for student aid programs, the School is subject to the provisions of Title VI of the Civil Rights Act of 1964.

## FACTUAL ALLEGATIONS

### A.     Professor Anthony Farley's Racially Discriminatory Classroom Conduct

21.     On the morning of January 13, 2025, Mr. Rupp attended the first day of the International Children's Rights course taught by Professor Anthony Farley.

22.     At the beginning of class, Professor Farley intentionally deactivated the classroom recording device.

23.                         Professor Farley then initiated a discussion unrelated to the course material, making a series of inflammatory and racially discriminatory statements, including but not limited to:

    a.  Professor Farley began by reframing widely recognized historical events in a manner designed to provoke and destabilize the classroom, asking students about the significance of "9/11" and rejecting a student's reference to the 2001 terrorist attacks as incorrect. He asserted instead that the only September 11 event students should care about was the 1973 CIA-backed coup in Chile, signaling that the class would be used as a forum for ideological commentary rather than course instruction.

    b.  He then explicitly turned to race, stating that the Founding Fathers — including George Washington and Thomas Jefferson — "were worse than Hitler" because they owned slaves, framing American history in a manner intended to portray white historical figures as inherently evil.

    c.  Professor Farley escalated this racial framing by making a sensational and false claim that George Washington had teeth forcibly taken from enslaved people to make his dentures and then compelled those same enslaved individuals to serve him food that he ate using those dentures, a graphic narrative designed to evoke disgust and collective guilt associated with whiteness.

d.  He next directed this racialized narrative at contemporary individuals, launching into a broad attack on white conservatives, proclaiming that they are racist bigots who hate black people and other minority groups and that they conceal these hatreds behind the label "conservative." In this context, he stated that "a conservative wants to conserve the past, so they want to conserve slavery," explicitly equating modern white conservative identity with pro-slavery racism.

e.  Having racialized the concept of "white conservatism," Professor Farley then individualized his attack. After asking whether any students were hunters and Mr. Rupp raised his hand, Professor Farley denigrated hunting as barbaric and then singled him out, stating, "Of course the guy in the hat hunts," using Mr. Rupp's attire as a proxy for racial and ideological stereotyping and publicly marking him as an exemplar of the racialized identity being condemned.

f.  Professor Farley continued this individualized racialization by describing "what conservatives look like — their appearance," referring to such individuals as "Daniel Boone" types. In context, this invoked the image of a primitive, backward frontiersman and was used to portray Mr. Rupp (who was wearing a flannel shirt at the time) as an unsophisticated white relic of the past who, in Professor Farley's words, hates black people and seeks to "conserve" slavery.

24.    These remarks were not part of any legitimate pedagogical exercise. They were not tied to the course syllabus, assigned readings, or learning objectives, and were delivered after Professor Farley disabled the classroom recording system. Instead, they consisted of sweeping racial generalizations and individualized mockery directed at Plaintiff Rupp, making him feel targeted, humiliated, and unwelcome in the classroom because of his race and identity.

25.    Unwilling to endure the hostile environment any longer after Professor Farley singled him and his attire out for more specific and individualized attention, Mr. Rupp packed his belongings to leave.

26.    To depart with a measure of dignity, he walked to the front of the classroom, placed his hand on Professor Farley's shoulder, and stated words to the effect of: "Thank you for that interesting half hour professor. I hope you have a good rest of the semester. I

won't be seeing you again." He then wished the professor good luck and calmly left the classroom.

27.     On the same day as the January 13, 2025 classroom incident, Professor Farley published a public Facebook post concerning Plaintiff Rupp to an audience of approximately 6,100 followers. In that post, Professor Farley again mocked Mr. Rupp's appearance, described him as having an "incel / MAGA look," referenced his "Daniel Boone clothes" and a "Remember the Alamo!" hat, and suggested that "in addition to racism, there are other illnesses in his head."

28.     Professor Farley's Facebook post did not identify Plaintiff by name but unmistakably referred to him and the classroom incident and was published within hours of Plaintiff's departure from class. The language of the post mirrored the racialized and stereotypical framing Professor Farley had employed in the classroom, further evidencing that his conduct was not merely pedagogical or political commentary, but a continuation of a pattern of demeaning, race-coded targeting of Plaintiff as a white, conservative student.

29.     Professor Farley's Facebook account was publicly accessible and followed by numerous members of the Albany Law School community, including faculty and administrators. Upon information and belief, individuals within the School's administration — including senior officials — were aware of the post and its content. For example, Professor Farley's Facebook account was followed by Albany Law School faculty and administrators, including Professor Keith Hirokawa, the chair of Mr. Rupp's disciplinary panel, and Albany Law School Dean Cinnamon Carlarne. Nevertheless, the School took no action to investigate, repudiate, or remediate Professor Farley's public attack on Plaintiff, did not instruct him to remove the post, and did not otherwise intervene.

30.     The School's failure to respond to Professor Farley's public, racialized attack further demonstrates its deliberate indifference to race-based harassment and its ratification of retaliatory conduct directed at Plaintiff following his protected complaint. Indeed, the incidents of January 13, 2025, were not isolated events but were consistent with Professor Farley's long-standing pattern and practice of misconduct at Albany Law School.  Since his arrival at the School, Professor Farley has repeatedly used similar racially charged rhetoric in public and semi-public statements to reinforce the same stereotypes reflected in his classroom conduct toward Plaintiff.

31.     For years, the School has knowingly permitted Professor Farley to use his classroom as a forum to launch into political, racial, and ideological rants, during which he specifically targets, ostracizes, bullies, and demeans white students, especially white conservative students.  Upon information and belief, multiple complaints and concerns regarding his racially charged classroom behavior were brought to the attention of Albany Law School administrators well before January 2025.

32.     To prevent the creation of evidence of this misconduct, Professor Farley frequently and intentionally turns off his classroom recording device before beginning his rants, and this is known to the School.

33.     The School has also turned a blind eye to Professor Farley's practice of abandoning the approved curriculum to facilitate his extended political and racial monologues. For example, Professor Farley's required Criminal Procedure course is taught not as an objective law class, but as a politically charged critical race theory and Jim Crow course that focuses on the theme of white people oppressing black people and generates constant complaints from students who are made to feel uncomfortable while being subjected to it.

34.     Professor Farley's abusive classroom behavior and retaliatory racial animus is so well known at the School that administrators — including Dean Jenean Taranto — and faculty — including Professor Vincent Bonventre — have taken to warning white, conservative students not to take his classes due to hostile racial and political environment that he creates.

**B.    The School's Retaliatory Disciplinary Process and Deliberate Failure to Investigate Mr. Rupp's First-in-Time Complaint**

36.     Immediately following the incident on January 13, 2025, Mr. Rupp went directly to the office of the Associate Dean for Academic Affairs, Rosemary Queenan, to report Professor Farley's unprofessional, discriminatory, and harassing conduct.  Dean Queenan was not in her office, but Mr. Rupp scheduled a meeting for early the following morning.

37.     On January 14, 2025, at approximately 9:15 a.m., Mr. Rupp met with Dean Queenan and lodged a complaint against Professor Farley's for his harassing classroom behavior.  It was Mr. Rupp's explicit understanding that this meeting initiated a complaint and that the School would commence an investigation into Professor Farley's conduct.  He also had a reasonable expectation that he would not be retaliated against for bringing it.

38.     However, at approximately two hours after his meeting with Dean Queenan concluded, at 11:47 a.m. on January 14, 2025, Professor Farley sent an email to Dean Cinnamon Carlarne and other Albany Law School administrators instituting his own complaint against Mr. Rupp.  Upon information and belief, Professor Farley's complaint was not a spontaneous action, but was filed in direct retaliation after Dean Queenan or another administrator notified him of the complaint Mr. Rupp had lodged against him earlier that same morning.

12

39.    At the time of the January 13, 2025 incident, and before he learned that Plaintiff had lodged a complaint against him, Professor Farley himself repeatedly described Plaintiff's conduct in non-violent and non-physical terms. In communications and public statements made that same day, Professor Farley characterized Plaintiff's departure in writing as merely "disruptive," stated that Plaintiff "packed his things and stormed out mid-class," and remarked that "all's well that ends well" after learning Plaintiff had withdrawn from the course. At no point during this period did Professor Farley claim that Plaintiff assaulted him, posed a threat, or engaged in racially motivated violence. Only after Professor Farley was informed that Plaintiff had complained about his racially discriminatory classroom conduct did he recharacterize the same incident as a "racist assault" and a "crazy and racist scene."

40.    In his January 14, 2025 email complaint to Dean Carlarne, however, despite having already been told that Mr. Rupp had dropped his class, Professor Farley played the part of the victim, demanding that the School "let security know that Roland (sic) Rupp . . . is to be kept away from me, from my office, from my classes . . . ."

41.    In contrast to the way his complaint was handled, Mr. Rupp was not told about Professor Farley's complaint against him for well over a week. On January 23, 2025, in an incident that underscores the bad-faith nature of Defendant's conduct, Dean Taranto summoned Mr. Rupp to her office. As Mr. Rupp waited for the meeting to begin, Professor Farley suddenly appeared outside her office, smiled mockingly at Mr. Rupp, and pretended to engage him in casual conversation, asking, "How are you doing today, Rowland?" Mr. Rupp ignored the taunt and reported it, again to no avail.

42.    The circumstances of this encounter give rise to a reasonable inference that Professor Farley had been informed in advance of the January 23, 2025 meeting between

Mr. Rupp and Dean Taranto just as he had earlier been informed of Mr. Rupp's complaint

against him. Mr. Rupp knew of the meeting beforehand, but Professor Farley had no legitimate

reason to appear outside Dean Taranto's office at that time unless he had been tipped off by the

administration. This conduct was especially troubling given that Professor Farley was actively

seeking a no-contact order against Mr. Rupp, yet nevertheless chose to approach and taunt the

very student he now claimed posed a threat.

43.    Immediately thereafter, Mr. Rupp entered Dean Taranto's office and was

informed for the first time that Professor Farley had filed a complaint against him.[1]

44.    Over the next three weeks, Mr. Rupp waited to hear the status of his

complaint against Professor Farley and how it would be handled by School administration, but

he was met with silence.

45.    On February 3, 2025, however, Dean Taranto sent Mr. Rupp a formal

"Disciplinary Investigation" letter, officially notifying him of the allegations against him and

imposing a "no further contact" order.  The charge was that he had disrupted the class by

departing it and had placed his hand on Professor Farley's shoulder while politely wishing him

good luck.[2]  There was no allegation, much less a charge, of a racially motivated assault.

46.    Over the next two months, Mr. Rupp had several follow-up meetings

(including February 7, 2025 and March 20, 2025) and communications with Dean Taranto

---

[1] Albany Law School's student disciplinary procedures are set forth in Chapter X of a document entitled "Residential and Flex JD Student Handbook 2024-2025," hereinafter the "Disciplinary Code."

[2] On February 3, 2025, Mr. Rupp originally was charged with, "Engaging in unprofessional conduct that adversely reflects on the student's fitness to become a lawyer and possible criminal or tortious conduct on Albany Law School property, alleged by Professor Anthony Farley to wit: that **you disrupted Professor Farley's International Children's Rights class** when, during lecture, you packed up your books/class materials and departed from the class. It is further alleged that when you were leaving the class **you placed your hand on Professor Farley, wished him good luck and informed Professor Farley that 'you will not see me again.'"** (*See* **Exhibit B**, Defendant's Letter to Rowland A. Rupp IV, dated February 3, 2025) (emphasis added).

concerning his complaint against Professor Farley and was led to believe that his complaint was being handled and investigated by the School.

47.     Upon information and belief, this was a deliberate misdirection coordinated by the School and orchestrated behind the scenes by Albany Law School's administration, as Mr. Rupp's complaint against Professor Farley was in fact being ignored and not pursued, while the complaint against Mr. Rupp was being co-opted and steered by Professor Farley and Dean Carlarne behind the scenes in violation of the procedures set forth in the School's Disciplinary Code.

48.     On March 27, 2025, Mr. Rupp met with Professor Vincent Bonventre, the appointed Reporter for the disciplinary matter.

49.     In that meeting, Mr. Rupp learned that Professor Bonventre was investigating only Professor Farley's complaint against him, and that his own complaint against Professor Farley was not part of the inquiry.

50.     That same day, Mr. Rupp emailed Deans Taranto and Queenan, stating that he had "serious concerns about this entire affair and the school's handling of it" and that he was "under the belief that the school has not acted on my complaint against Professor Farley in any way."

51.     He reiterated that his January 14 meeting with Dean Queenan was intended to lodge a formal complaint and demanded action.

52.     In response, on March 28, 2025, the Deans began a coordinated effort to create a pretext for their inaction.

53.     Dean Queenan replied, "When we met, you did not indicate a request to file a formal complaint."

15

54.    Dean Taranto followed minutes later, stating, "When you and I met, you did not indicate to me that you wanted to file a complaint of any kind" and directed him to the Title IX coordinator, Odelia Levy, if he wished to "begin the complaint process."

55.    This was the first time any administrator had claimed Mr. Rupp had failed to use unspecified "magic words" to initiate his complaint, which was not a requirement of the School's Harassment Policy.[3]  Indeed, the Harassment Policy reads exactly the opposite:

> An individual reporting an incident is expected only to relay the facts in good-faith; Albany Law School representatives will assist the complainant in determining whether the incident may constitute a violation of this or another Albany Law School policy.

Albany Law School Harassment Policy, at p. 117.

56.    The School then began shuffling Mr. Rupp's complaint between offices in a bureaucratic shell game.

57.    For example, on March 31, 2025, after Mr. Rupp had complained in writing and in a virtual meeting with Deans Queenan and Taranto that his complaint was being ignored, Dean Taranto finally referred the matter to Title IX Coordinator Odelia Levy as a harassment claim.

58.    But on April 11, 2025, Ms. Levy sent Mr. Rupp a written email purporting to "close" her office's review of his harassment complaint against Professor Farley. In that email, Ms. Levy acknowledged that allegations of harassment outside the Title IX realm are evaluated under Albany Law School's "Student Policy on Harassment, Sexual Assault & Relationship Violence," but nevertheless concluded that Mr. Rupp's allegations "do not fall within this Policy" and therefore fell "outside the purview of this office."

---

[3] Albany Law School's "Student Policy on Harassment, Sexual Assault & Relationship Violence" is set forth in Chapter IX of the "Residential and Flex JD Student Handbook 2024-2025," hereinafter the "Harassment Policy."

59.    In reaching that conclusion, Ms. Levy did not conduct any investigation, did not interview witnesses, did not evaluate the totality of the circumstances, and did not refer the matter to the Harassment Committee as required by the Harassment Policy.  *See* Harassment Policy § XIII entitled "Complaint Procedure," at p. 128.  Instead, she relied on her own characterization of the allegations as involving "political views" and "hunting and dress associated with hunting," and on an alleged statement attributed to Mr. Rupp during their meeting that he did not perceive the conduct to be connected to a protected characteristic.

60.    Ms. Levy's April 11 email imposed a requirement nowhere found in the Harassment Policy — namely, that a student complainant must correctly identify and articulate the legal basis for harassment at the intake stage to trigger the School's investigatory obligations. The Harassment Policy expressly provides the opposite: that a reporting individual is expected only to relay the facts in good faith, and that Law School representatives will assist in determining whether reported conduct may constitute harassment under the policy.  The Harassment Policy also required Ms. Levy to "discuss with the complainant the options available under this policy and ensure that a written document is prepared capturing the substance of the complaint," and states "[i]n the event Albany Law School receives a report that this policy has been violated, the report *will* be investigated by the Harassment Committee and/or designee(s}." *Id.* at pp. 128-29 (emphasis added).  None of these things happened.

61.    By treating Mr. Rupp's intake discussion as dispositive, Ms. Levy improperly substituted her own gatekeeping judgment for the investigatory process mandated by the Harassment Policy, effectively insulating Professor Farley from scrutiny without any assessment of context, pattern, intent, or impact. This was particularly unreasonable given that Mr. Rupp's allegations involved being singled out, demeaned, and stereotyped in front of

classmates using racially coded language tied to his appearance and dress — conduct that, under the School's own policies, warranted further inquiry rather than summary dismissal.

62.     Ms. Levy's decision to "close" the matter and redirect it back to Dean Taranto — rather than refer it to the Harassment Committee — was not authorized by the Harassment Policy and did not constitute a good-faith application of that policy. Instead, it functioned as a procedural dead-end that delayed and obstructed any meaningful review of Mr. Rupp's first-in-time complaint while the School simultaneously advanced and escalated Professor Farley's retaliatory complaint against him.

63.     The contrast between Ms. Levy's summary dismissal of Mr. Rupp's harassment complaint and the School's aggressive pursuit of Professor Farley's counter-complaint underscores the retaliatory and selective nature of the School's response. While Mr. Rupp's allegations were mishandled under the School's Harassment Policy to his detriment and reframed as non-actionable based on labels and technicalities, Professor Farley's allegations were also mishandled under the School's Disciplinary Code — again to Mr. Rupp's detriment — as they were actively being racialized, expanded, publicized, and treated as exigent despite their evolving nature.

64.     Ms. Levy's April 11, 2025 email thus marked a critical point at which Albany Law School, with actual knowledge of Mr. Rupp's allegations, chose diversion and inaction over investigation. That choice was unreasonable, inconsistent with the School's written policies, and foreseeably resulted in the continued denial of any investigation into race-based misconduct by Professor Farley, contributing to a pattern of deliberate indifference and retaliation against Mr. Rupp for engaging in a protected activity.

65.     Critically, Ms. Levy intentionally ignored the racial elements of Mr. Rupp's complaint, framing it instead as an issue of politics and dress code, in stark contrast to how the School was actively racializing the complaint against Mr. Rupp for "disrupt[ing]" class and "plac[ing] his hand" on Professor Farley's shoulder.

66.     On May 29, 2025, after receiving notice of his own disciplinary hearing, and having heard nothing whatsoever with respect to the status of his first-in-time complaint against Professor Farley from Ms. Levy or anyone else, Mr. Rupp again followed up with Ms. Levy on the status of his complaint.

67.     On May 30, 2025, Ms. Levy advised Mr. Rupp that her office had referred the matter back to Dean Taranto's office on April 11, 2025.  On June 4, 2025, Ms. Levy emailed him again, stating she had since "learned that [Mr. Rupp's complaint against Professor Farley] was supposed to be sent to the Harassment Committee" and she was "rectifying that procedural error" by making the referral.  By this time, nearly five months had passed from the date of the January 13, 2025 classroom incident and Mr. Rupp's next-day complaint.

**C.      The School's Belated, Pretextual Rejection of a Race-Based Complaint**

68.     For more than seven months following the January 13, 2025 classroom incident, Albany Law School failed to conduct any investigation into Mr. Rupp's first-in-time complaint concerning Professor Anthony Farley's classroom conduct. Despite repeated inquiries by Mr. Rupp concerning the status of his complaint, Albany Law School did nothing.

69.     Albany Law School's prolonged inaction persisted until after counsel for Mr. Rupp transmitted a formal litigation-hold notice to the School on August 4, 2025, addressed

to senior administrators, faculty members, and disciplinary panel participants, advising that

federal civil-rights litigation was anticipated as a result of the School's inaction.

70.     On August 11, 2025 — after nearly seven months of waiting for Albany

Law School to act on his January 14, 2025 complaint — Albany Law School was served through

its outside counsel and several members of its Board of Trustees with a detailed letter from

Mr. Rupp's attorney enclosing a draft version of this complaint alleging Title VI and 42 U.S.C. §

1981 violations relating to the January 13, 2025 incident and Albany Law School's handling of

Mr. Rupp's complaint.  The letter made crystal clear the nature of Mr. Rupp's allegations against

Professor Farley:

> We write to put the law school on formal notice of the federal civil rights violations
> that have occurred and to demand that the school immediately cease its retaliatory
> and discriminatory actions against our client. As you will see from the enclosed draft
> of a federal complaint, which we are fully prepared to file, the school's handling of
> this matter constitutes an absolute miscarriage of justice. The investigation and
> pending charges against Mr. Rupp are the direct result of a sham process, tainted by
> improper influence, racial animus, and a clear retaliatory motive. The enclosed
> complaint details a pattern of misconduct and selective enforcement that is
> shocking for any institution, let alone a school of law. The allegations, supported
> by documentary evidence and witness testimony, include:
>
> **Creation of a Racially Hostile Environment**: Professor Farley subjected
> Mr. Rupp to a tirade of unprofessional, discriminatory, and racist commentary,
> explicitly targeting him as a white, conservative student.
>
> **Retaliation and Selective Enforcement**: After Mr. Rupp lodged a formal, first-
> in-time complaint, the school ignored it. Instead, it aggressively pursued a
> retaliatory counter-complaint from Professor Farley, allowing the initial benign
> charge of a classroom disruption to be secretly morphed into a fabricated narrative
> of a violent, racist assault.
>
> **Procedural and Due Process Violations**: The school's investigation was
> fundamentally flawed, violating its own rules of confidentiality by allowing
> Professor Farley, the Black Law Students Association (BLSA), a member of the
> school's DEI Staff, and other non-witnesses to improperly steer the proceedings.
>
> **A Pattern of Capitulation**: This is not an isolated incident. The school has a
> long-standing and well-documented history of capitulating to Professor Farley's

misconduct and weaponized accusations of racism, at the expense of its students and other tenured faculty.

71.     The draft complaint alleged, in explicit and unequivocal terms, that Professor Farley had engaged in racially discriminatory conduct toward Mr. Rupp as a white student, that Albany Law School had retaliated against Mr. Rupp for complaining about that conduct, and that the School had selectively enforced its policies in a manner that favored Professor Farley and disadvantaged Mr. Rupp.  By way of example, the draft complaint contained the following numbered paragraphs:

1.    This action arises from a law school's deliberate and retaliatory perversion of its own disciplinary process to punish and silence a student who refused to endure a professor's unhinged, unprofessional, and racially discriminatory tirade on the first day of class.

24.    These remarks were not part of any legitimate pedagogical exercise but were a direct, unprovoked, racist attack on Mr. Rupp as a white, conservative student, making him feel targeted, uncomfortable, and humiliated in front of his peers.

29.    For years, the School has knowingly permitted Professor Farley to use his classroom as a forum to launch into political, racial, and ideological rants, during which he specifically targets, ostracizes, bullies, and demeans white students, especially white conservative students.

33.    Professor Farley's abusive classroom behavior and retaliatory animus is so well known at the School that administrators — including Dean Taranto — and faculty — including Professor Bonventre — have taken to warning white, conservative students not to take his classes due to hostile racial and political environment that he creates.

83.    This includes the School's long-standing practice of turning a blind eye to his repeated targeting and bullying of white students in his classroom — especially white conservative students — thereby endorsing his creation of a hostile and discriminatory educational environment.

102.   Defendant, acting under color of its authority, intentionally subjected Mr. Rupp, who is white, to discrimination on the basis of his race.

103.   Professor Farley's diatribe was not merely political; it was explicitly framed in racial terms. His statements that "a conservative wants to conserve the past, so they want to conserve slavery" and that conservatives hate black people were targeted at white students, and his pejorative labeling of Mr. Rupp as a "Daniel Boone" type because of his attire was not directed at a political ideology in a

vacuum, but at Mr. Rupp as a white student whom he stereotyped, profiled, and ridiculed in front of his peers. This conduct created a racially hostile educational environment in direct violation of Title VI.

109. As a direct and proximate result of Defendant's creation of a racially hostile environment and its subsequent discriminatory and retaliatory actions, Mr. Rupp has been denied the benefits of the School's educational program and has suffered significant and ongoing damages.

75.    No institution receiving the August 11, 2025 correspondence and the enclosed federal civil-rights complaint could possibly have misunderstood that Mr. Rupp was making claims of racial discrimination and retaliation, yet Albany Law School proceeded to do exactly that.

76.    In a letter dated September 25, 2025 — over eight months after the classroom incident and six weeks after the School received the August 11, 2025 cease-and-desist letter and draft complaint — Professor Joseph M. Connors, the chair of an appointed subcommittee of Albany Law School's Harassment Committee, advised Mr. Rupp that it would not pursue his complaint against Professor Farley because Mr. Rupp had allegedly informed Odelia Levy — who was identified in Mr. Connors's letter not by her actual title as Albany Law School's Title IX Coordinator but by her former title as Harassment Committee Chair — that Professor Farley's conduct "neither stemmed from nor was connected to any of the protected areas in the school's harassment policy," which included "race, creed, [and] color."

77.    Thus, instead of relying on Mr. Rupp's detailed, written allegations of racial discrimination and relation contained in the August 11, 2025 cease-and-desist letter and the draft complaint alleging violations of Title VI and 42 U.S.C. § 1981, Professor Connors and the subcommittee chose to focus instead on an alleged "interview" Mr. Rupp held with the Title IX Coordinator in which Mr. Rupp allegedly gave some verbal indication that Professor Farley's conduct was not connected to race.  To make this "interview" look more

official and as if it were part of the harassment investigation process required by the Harassment

Policy (which it was not), Professor Connors referred to Ms. Levy by her former title as

Harassment Committee Chair as if to imply that she had conducted the "interview" in that

capacity.

### D. The Requirements of Albany Law School's Harassment Policy

78.     Albany Law School maintains a written Student Policy on Harassment,

Sexual Assault, and Relationship Violence ("Harassment Policy"), which governs the receipt,

intake, investigation, and resolution of complaints alleging harassment on the basis of protected

characteristics, including race, creed, and color.  The policy is drafted broadly:

> I. Statement of Purpose
>
> Albany Law School recognizes the enriching effects of human diversity in all its
> forms on the Albany Law School community and the broader legal profession.
> and Albany Law School also clearly understands that discrimination, harassment.
> abuse, or exclusion on the basis of an individual's personal characteristics may
> severely impair the ability of an individual to contribute to and benefit from the
> life of Albany Law School.

*See* Harassment Policy at p. 115.  Further:

> II. Scope of the Policy
>
> This policy applies to behavior engaged in, or experienced by, any student.

*Id.*  And:

> III. Definition of Harassment
>
> Albany Law School prohibits the harassment of any student, staff member or
> faculty member on the basis of legally protected characteristics. This includes
> harassment because of race, creed, color . . .  Merely by way of example,
> harassing conduct may consist of epithets, slurs. racially or religiously offensive
> jokes or graffiti, or being targeted for hostile or degrading treatment because of

one's race, color, national origin, ethnicity, and other characteristics listed above.

*Id.* at p. 116.  The Harassment Policy also states:

> The following list provides examples of the kind of behavior that may be harassing:
>
> ***Verbal*** – examples: vulgar or lewd statements; racial, ethnic or religious slurs; name-calling; demeaning or denigrating a person because of their color or ethnic background; and so on

*Id.*

79.    The Harassment Policy also expressly prohibits retaliation:

> XII. Retaliation
>
> Albany Law School policy and applicable law prohibit retaliation against any individual who files a good-faith complaint, or assists, or participates in good-faith in any manner, in an investigation or proceeding conducted by Albany Law School or an external agency. Any retaliation is subject to disciplinary action, up to and including expulsion/termination.

*Id.* at 128.

80.    Contrary to the implications of Professor Connors's September 25, 2025 letter, the Harassment Policy does not require a complainant to use specific legal terminology or to classify conduct at the intake stage. To the contrary, the policy provides that an individual reporting an incident is expected only to relay the facts in good faith, and that Albany Law School representatives will assist the complainant in determining whether the reported conduct may constitute a violation of the policy or another institutional policy.  In this regard, the Harassment Policy reads as follows:

> An individual reporting an incident is expected only to relay the facts in good-faith; Albany Law School representatives will assist the complainant in determining whether the incident may constitute a violation of this or another Albany Law School policy.

Harassment Policy, Ex. ___, at p. 117.

81.    The Harassment Policy further provides that reports of harassment may be made verbally or in writing, including to the Title IX Coordinator, the Office of Student Affairs, or any member of the Harassment Committee, and that "[A]ll Albany Law School faculty, staff, and administrators have a duty to report . . . any reported or suspected violations of this policy." *Id.* at p. 122.  Nothing in the policy authorizes a single administrator or former committee member or chair to unilaterally terminate a complaint based on an initial intake conversation.

82.    Upon receipt of a report alleging harassment, the Harassment Policy also `requires that a "written document" be prepared capturing the substance of the complaint, that the complainant be advised of available options under the policy, and that the matter be referred to the Harassment Committee for further action.  In this regard, the Harassment Policy reads as follows:

> Complaint Intake:
>
> 1. Upon notification to the Title IX Coordinator, Director of Human Resources or any member of the: Harassment Committee of a complaint, the Title IX Coordinator or other appropriate person will discuss with the complainant the options available under this policy and ***ensure that a written document is prepared capturing the substance of the complaint***.

*Id.* at p. 129 (emphasis added).

83.    Upon information and belief, no written document contemplated by the Harassment Policy was prepared by Odelia Levy at the time she met with Mr. Rupp or at any time before she advised him that the Title IX office would be unable to assist him with his complaint.  Her emails refer only to Mr. Rupp's alleged statement and her "notes."

84.     The Harassment Policy specifies that investigations are to be conducted by investigators appointed from the Harassment Committee, that investigators are to gather information from the complainant, the respondent, and relevant witnesses, and that a written investigative report with findings and rationale be prepared and communicated to the parties.  *Id.* at pp. 128-29.  The policy does not permit jurisdictional determinations to be made without investigation, nor does it authorize the dismissal of a complaint based solely on the Title IX Coordinator's interpretation of an alleged oral statement made during an intake consultation.

85.     Notwithstanding these mandatory provisions, Albany Law School did not prepare a written summary of Mr. Rupp's harassment complaint, did not refer the complaint to the Harassment Committee in a timely manner, did not appoint investigators, did not interview witnesses, and did not conduct any investigation into whether Professor Farley's classroom conduct constituted harassment under the policy.

86.     Instead, after more than eight months of inaction and only after Albany Law School had been placed on formal notice of impending federal civil-rights litigation, the harassment subcommittee issued a letter purporting to reject Mr. Rupp's complaint for lack of jurisdiction based on the alleged oral acknowledgment attributed to Mr. Rupp during an earlier meeting with the Title IX Coordinator.

87.      In issuing this belated jurisdictional rejection, the harassment subcommittee disregarded the Harassment Policy's requirement that determinations be made based on investigation and evaluation of the totality of the circumstances, and instead relied on a selectively characterized intake interaction while ignoring the detailed, written allegations of racial discrimination and retaliation set forth in Mr. Rupp's August 11, 2025 cease-and-desist letter and enclosed draft federal complaint.

88. Albany Law School's invocation of the Harassment Policy in this manner was therefore not a good-faith application of its procedures, but a pretextual maneuver designed to avoid investigating race-based misconduct by a tenured faculty member after the School had already chosen to aggressively pursue a retaliatory and racialized disciplinary proceeding against Mr. Rupp.

89. The harassment subcommittee's belated determination was not the product of a timely or good-faith investigation, but rather a post-hoc jurisdictional rejection issued only after Albany Law School had already violated the provisions of its own Harassment Policy and shuttled Mr. Rupp from office to office in a fruitless quest to have his complaint against Professor Farley taken seriously.

90. In reaching its jurisdictional conclusion, the subcommittee ignored the context and substance of Mr. Rupp's now-written complaint, which alleged that Professor Farley had made racially discriminatory statements about white conservatives and repeatedly singled him out in class using racially coded language and stereotypes, including mocking references to Mr. Rupp's attire, hunting, and appearance as "Daniel Boone"–type characteristics. Such language functions as a well-recognized racial dog whistle, using clothing, lifestyle, and appearance as proxies to ascribe negative moral, intellectual, and racialized traits to white individuals, particularly white conservative students.

91. Nor did Professor Farley's conduct occur in a vacuum. His remarks were made in the context of a broader classroom tirade asserting that white conservatives "want to conserve slavery," that they are inherently racist, and that individuals who look like Mr. Rupp embody those characteristics. He repeated his remarks about Mr. Rupp's attire and appearance in writing in his Facebook post that same day. The targeting of Mr. Rupp's clothing and

appearance served as a mechanism to racialize him personally without explicit racial slurs, a tactic that Albany Law School later endorsed by artificially divorcing the conduct from race in order to disclaim jurisdiction.

92.    Albany Law School's refusal to recognize this conduct as race-based, its decision to wait until threatened litigation before taking any action, and its ultimate issuance of a conclusory jurisdictional denial together demonstrate deliberate indifference to racial discrimination and a retaliatory institutional response to Mr. Rupp's protected opposition to such conduct.  The mishandling, deflection, avoidance, and failure to pursue Mr. Rupp's complaint is in keeping with the School's years-long refusal to investigate Professor Farley's unprofessional, racist antics and misbehavior, which has created a hostile and discriminatory racial environment for white students and faculty alike.

93.    While Mr. Rupp's first-in-time complaint was ignored, deflected, and lost in a maze of feigned procedural confusion, the retaliatory and racialized complaint against him was swiftly initiated and subsequently converted into and investigated as a racial episode, demonstrating a clear and intentional policy of selective, racially discriminatory, retaliatory, and bad-faith enforcement of the School's rules.

**E.    The Sham Investigation Tainted by Bias and Improper Influence**

95.    The procedural irregularities described below are not alleged to establish mere noncompliance with Albany Law School's internal rules for its own sake. Rather, they are pleaded as circumstantial evidence that the School deliberately manipulated its disciplinary process in response to Mr. Rupp's protected opposition to race-based misconduct, and to ensure a predetermined, retaliatory, and racially charged outcome adverse to him.

96.     The supplemental investigation conducted by Professor Vincent Bonventre and the subsequent panel review were fundamentally flawed, procedurally irregular, and outcome-driven. The investigation did not function as a neutral fact-finding process, but instead operated as a vehicle through which Professor Farley's retaliatory and racialized narrative was adopted, amplified, and institutionalized with the knowledge and approval of Albany Law School administrators.

97.     Under the School's published disciplinary procedures, once a supplemental investigation is ordered, the appointed Reporter is required to conduct a confidential inquiry limited to the charged conduct, involving only relevant parties and witnesses, and free from outside influence. The basic safeguards exist to preserve neutrality and prevent advocacy or political pressure from shaping disciplinary outcomes.

98.     Albany Law School failed to enforce even the most basic neutrality requirements of its own process. It permitted Professor Farley to dictate the terms and sequencing of the investigation by refusing to cooperate unless the Reporter first met with senior administrators, including Dean Carlarne, to receive what Professor Farley characterized as "updates" regarding how the investigation should proceed. Rather than rejecting this condition as improper, the School acquiesced, thereby allowing Professor Farley to reshape the investigation to conform to his retaliatory objectives.

99.     Professor Bonventre, acting as Reporter, abandoned the pretense of a fair investigation at the outset. Rather than maintaining confidentiality and independence, he opened the investigation to individuals and groups who were not witnesses to the January 13, 2025 incident and who had no legitimate role in the disciplinary process. Among other things, at the behest of Albany Law School Dean Cinnamon Carlarne, he allowed his confidential

investigation to be corrupted and influenced by Albany Law School Black Law Students

Association ("BLSA"), which wrote a letter commenting on Mr. Rupp's confidential disciplinary

proceeding. Then, at the specific direction of Dean Carlarne and others, he conveyed that letter

to the disciplinary panel as part of the investigative record against Mr. Rupp.

100. The BLSA, for which Professor Farley serves as a long-time faculty

advisor, was invited to inject political and racial framing into the disciplinary process. In a letter

to Dean Cinnamon Carlarne dated March 28, 2025, the BLSA linked Mr. Rupp's confidential

disciplinary matter to broader political grievances concerning the 2024 presidential election and

asserted that the "current climate of America" had "seeped itself into" Albany Law School. The

letter framed the disciplinary matter pending against Mr. Rupp as a symbolic test of institutional

allegiance rather than an individualized assessment of student conduct.

101. The avowed purpose of the BLSA's letter was to "voice our concerns

regarding the ongoing situation with one of our most esteemed professors." The letter described

Mr. Rupp's departure from the classroom on January 13, 2025 as "patronizing," "impertinen[t],"

"impudent," and a demonstration of "misplaced superiority." The BLSA letter urged

Dean Carlarne to recognize the heightened level of respect that it thought should be afforded to

Professor Farley, stating: "Not only does this professor merit the same level of respect afforded

to other faculty members, but many would argue that his distinguished legal career warrants even

greater respect." The letter specifically linked the January 13, 2025 incident involving Petitioner

to its perception of the political and racial climate existing in the country, stating: "This incident

is a symptom of the infection barreling through American society and we must ensure that the

Black community feels protected and welcomed within these walls." The BLSA letter also urged

that the January 13, 2025 incident be seen as a litmus test: "We do not want an incident like this to be what Albany Law is known for accepting." *Id.*

102. Predictably, the investigation further departed from neutrality by expanding far beyond the actual disciplinary charges issued against Mr. Rupp. The original charges, issued by Dean Taranto on February 3 and March 4, 2025, alleged only that Mr. Rupp disrupted class by departing and briefly placed his hand on Professor Farley while politely wishing him good luck and then calmly departing the classroom. Those charges did not allege violence, racism, assault, or discriminatory intent.

103. At Professor Farley's insistence and with the active cooperation of Dean Carlarne, however, the focus of the investigation shifted away from the charged conduct and toward uncharged allegations of racial hostility and physical assault. In an April 22, 2025 email to the Reporter, Professor Farley labeled the incident as a "racist assault" and demanded the involvement of Associate Dean Jermaine Cruz, a member of the School's DEI staff who had no firsthand knowledge of the events. This demand was honored, further embedding racial advocacy into what was supposed to be a neutral evidentiary inquiry.

104. Professor Bonventre's own investigative report confirms that this advocacy was not merely received but actively solicited and operationalized. He acknowledged that Dean Carlarne, Professor Farley, and Associate Dean Cruz each expressed concern that the BLSA letter be incorporated into the "disciplinary considerations," and sought assurance that it would be presented to Mr. Rupp's disciplinary panel. The result was an investigation shaped by political and racial advocacy from non-witnesses rather than by neutral fact-finding.

105. Following Mr. Rupp's protected complaint against Professor Farley, the investigation further evolved into an act of retaliation through the quiet escalation of charges

without notice. Although Mr. Rupp was never formally charged with assault or racial misconduct, the Supplemental Investigation Report dated May 4, 2025 reframed the same conduct previously described as a polite departure into a "slap" delivered with "considerable force," employing inflammatory terminology such as "aggressive," "assaulted," and "battered."

106.    The Supplemental Investigation Report also explicitly racialized the incident, incorporating Professor Farley's unsupported claim that the episode constituted a "pretty crazy and racist scene." The report further repeated Farley's rhetoric alleging that Albany Law School has a history of "supporting racist and disruptive white behavior," and revived his baseless insinuations that Mr. Rupp posed a safety threat.

107.    Mr. Rupp was never notified that the investigation had expanded to include these de facto accusations of racially motivated assault, nor was he afforded any opportunity to respond to or defend against them. Instead, the racialized narrative was presented to the disciplinary panel as if it were a legitimate extension of the original charge, thereby depriving Mr. Rupp of notice and a meaningful opportunity to be heard.

108.    At the urging and behest of Professor Farley, and with the knowing cooperation of senior administrators, including Dean Carlarne, the School thus transformed a narrow allegation of classroom disruption into a racialized proxy proceeding in which Mr. Rupp's conduct was evaluated not on its own terms, but as a test of ideological and racial alignment with a professor who was well known at the School for racializing disputes.

109.    The retaliatory nature of this process was further confirmed by communications from the disciplinary panel itself. Before any hearing occurred or a single witness had been called, the Reporter declared Mr. Rupp guilty of misconduct to a clear-and-convincing standard, and the panel chair, Professor Keith Hirokawa, informed Mr. Rupp that he

would likely be found guilty and suspended by the disciplinary panel if the matter proceeded to a hearing, making clear that the hearing itself was a mere formality and that the outcome had already been decided. The procedural deviations described above did not merely depart from internal norms; they functioned to predetermine an outcome adverse to Mr. Rupp because he opposed racially discriminatory conduct by a tenured faculty member the School was unwilling to confront.

**F.    The School's Pattern of Capitulating to Professor Anthony Farley and Selectively Enforcing its Rules**

109.    Defendant's disparate treatment of Mr. Rupp is not an isolated incident. Rather, it is consistent with a long-standing pattern and practice at Albany Law School of being manipulated by Professor Farley and capitulating to his demands, particularly when he engages in racist behavior and then weaponizes baseless and retaliatory accusations of racism against his victims to intimidate students, colleagues, and the administration itself.

110.    The School has for years knowingly permitted Professor Farley to engage in a pattern of unprofessional and destructive behavior, providing him with special privileges and benefits not afforded to other faculty — such as by allowing him to cancel up to a third of his classes without repercussions and allowing him to take sabbaticals without normal academic publishing requirements — while refusing to hold him accountable for his actions. This includes the School's long-standing practice of turning a blind eye to his repeated targeting and bullying of white students in his classroom — especially white conservative students — thereby endorsing his creation of a hostile and discriminatory educational environment.

111.    Upon information and belief, the School has been aware of Professor Farley's alarming conduct for well over a decade. This pattern includes public tirades

against senior administrators, such as calling a former Dean "worthless and a horrendous person" in front of hundreds of legal professionals for suggesting he spend more time with students. The School, however, took no action.

### The Professor Danshera W. Cords Comparator Incident

114.    Professor Danshera W. Cords served on the faculty of Albany Law School for approximately fifteen years and held senior leadership positions, including as co-Chair of the Faculty Hiring Committee and Faculty Parliamentarian. In those roles, Professor Cords was responsible for enforcing faculty governance rules and ensuring that hiring decisions complied with institutional standards and applicable law.

115.    During the 2020–2021 faculty hiring season, at an early Faculty Hiring Committee meeting conducted by Zoom, Professor Anthony Farley urged the Committee to focus exclusively on candidates who were people of color and to disregard white candidates altogether. Professor Cords objected, stating that the Committee was required to consider the overall quality of all candidates and that adopting a race-exclusive hiring process would violate New York State and federal law.  She was so concerned by these remarks that she told Professor Farley that if he raised the issue again, she would terminate the meeting.

116.    When Professor Farley later repeated his recommendation that the Committee consider only candidates of color and disregard white candidates, Professor Cords reiterated that she would not participate in an unlawful discriminatory process. Rather than allow the discussion to continue in violation of the law and faculty governance rules, she ended the Zoom meeting.

117.    Shortly after the meeting ended, while Professor Cords was in the fifth-floor photocopier area near her office, Professor Keith Hirokawa angrily approached her in the

34

presence of a faculty assistant and confronted her in a raised voice. He admonished her in substance, "You are never to talk to [Professor] Farley like that again," and advanced toward her, backing her toward a wall. Although no physical contact occurred, Professor Hirokawa's proximity, posture, and tone were physically intimidating and caused Professor Cords to feel shocked and alarmed.

118.    Professor Cords later spoke with the faculty assistant, who also found the encounter with Professor Hirokawa upsetting, and raised concerns with senior administrators regarding whether she could continue to serve in her committee role given the increasingly toxic environment. Albany Law School took no action to address either Professor Hirokawa's intimidation or Professor Farley's conduct that precipitated it.

119.    In late November or early December 2023, during an in-person faculty meeting that included a hiring segment and at which Professor Cords was serving as Faculty Parliamentarian, Professor Farley again departed from the agenda to revisit a prior season's decision not to hire a minority faculty candidate. Professor Cords ruled the discussion out of order and directed the faculty to return to the agenda in accordance with established procedures.

120.    In response, Professor Farley became angry and directed invectives toward Professor Cords before the meeting eventually returned to order.  At the conclusion of the meeting, however, in the presence of assembled faculty members and deans, including Albany Law School Dean Cinnamon Carlarne, Professor Farley berated Professor Cords for approximately five minutes, accusing her of racism, attacking her character, and directing ad hominem insults toward her.  When nobody intervened, Professor Cords stated that she was done being yelled at and left the room.

121.    Although colleagues acknowledged that Professor Farley's conduct toward Professor Cords was inappropriate, Albany Law School did not discipline Professor Farley, did not require him to retract his accusations or apologize, and did not take any corrective or remedial action — either for his repeated advocacy of unlawful, race-based hiring or for his public attacks on a senior faculty member who objected to that conduct.

122.    Following these events and as a direct result of the School's failure to address Professor Farley's conduct, Professor Cords took medical leave for approximately six months under the Family and Medical Leave Act and thereafter took leave from the law School for a year without pay, and ultimately retired as Distinguished Professor Emerita on June 30, 2025. Her departure was driven by the hostile environment created by Professor Farley's unchecked conduct and Albany Law School's refusal to intervene.

123.    Albany Law School's tolerance of Professor Farley's open advocacy of unlawful race-based decision-making, its failure to protect a senior faculty leader who objected to that illegality, and its acquiescence in retaliatory intimidation and public accusations of racism further demonstrate the School's longstanding practice of capitulating to Professor Farley and selectively enforcing its rules. This pattern mirrors the School's treatment of Mr. Rupp and supports an inference that opposition to Professor Farley — particularly by white faculty or white students who challenge his conduct — results in institutional abandonment and retaliation rather than protection.

124.    The foregoing allegations are supported by sworn testimony from Professor Danshera W. Cords, former Chair of the Faculty Hiring Committee and Faculty Parliamentarian, whose affidavit will be produced in this action.

### The Professor Michael J. Hutter Comparator Incident

125.    Professor Michael J. Hutter is a tenured faculty member at Albany Law School who has served on the faculty since 1976 and is among the most senior members if not the most senior member of the institution. Over the course of Professor Farley's tenure, Professor Hutter has repeatedly witnessed and experienced Professor Farley's practice of accusing colleagues of racism whenever they disagree with him on matters of academic judgment, faculty governance, hiring, or institutional policy.

126.    In or about December 2023, during a faculty hiring meeting, Professor Hutter opposed the hiring of a candidate — who was a person of color and a personal friend of Professor Farley's — on merit-based grounds, including that the candidate could not articulate what course he would teach and did not meet the School's curricular needs. Professor Hutter's opposition was based solely on academic and institutional considerations.

127.    In response, Professor Farley erupted in a public and unprovoked tirade during the meeting, repeatedly accusing Professor Hutter of racism, and falsely alleging that Professor Hutter had racially and sexually harassed former women faculty of color. Professor Farley provided no factual support for these accusations and, using a loud voice, prevented Professor Hutter from meaningfully responding. No administrator or faculty member intervened to stop the attack or to correct the false accusations.

128.    Following the meeting, Professor Farley circulated an email to all faculty quoting Professor Hutter's alleged "foul language" during the confrontation, thereby attempting to reframe his own outburst as justified and to publicly stigmatize Professor Hutter. This tactic mirrors Professor Farley's later effort to recharacterize Plaintiff Rupp's calm and respectful

departure from his classroom as a "crazy and racist scene" and an example of "racist and disruptive white behavior."

129.    In further contrast to the School's aggressive and expedited treatment of Mr. Rupp, Professor Hutter was subjected to an unsubstantiated harassment allegation instigated by or traceable to Professor Farley. Although Albany Law School retained an outside investigator who investigated the allegation and found no substantiation, the School refused to resolve the matter or allow a hearing for Professor Hutter to clear his name until he threatened a lawsuit. The School's decision to allow a baseless allegation to linger for two years without resolution illustrates the School's selective deployment of its disciplinary machinery depending on who initiates the accusation and against whom it is directed.

130.    Despite Professor Farley's repeated public accusations against Professor Hutter and other faculty members, Albany Law School took no disciplinary action against Professor Farley, did not require him to retract his false statements, and did not impose any corrective measures. Instead, the School tolerated Professor Farley's conduct and allowed him to continue labeling colleagues as racists whenever his proposals or views were rejected.

131.    Notably, Professor Farley named Professor Hutter in his February 2, 2025 email to Dean Taranto regarding Mr. Rupp, asserting that he had no confidence in the disciplinary process because the School allegedly "support[s] racist and disruptive white behavior," and citing Professor "Mike Hutter's still-unchecked behavior" as an example.

132.    Albany Law School's tolerance of Professor Farley's false accusations against Professor Hutter — a senior, white faculty member who opposed Farley's faculty recommendations on merit-based grounds — and its refusal to discipline Professor Farley for making those accusations, is consistent with the School's broader practice of capitulating to

Professor Farley and selectively enforcing its rules. Rather than correcting or repudiating Professor Farley's conduct, Albany Law School repeatedly has permitted him to accuse colleagues of racism without consequence and to continue weaponizing such accusations against those who disagree with him.

133.    The foregoing allegations are supported by sworn testimony from Professor Michael J. Hutter, a tenured faculty member who has served at Albany Law School since 1976 and is the most senior member of the faculty, whose affidavit will be produced in this action.

**Albany Law School's Institutional Capitulation to Professor Farley**

134.    The School's tolerance of Professor Farley's misconduct extends to allowing him to publicly undermine other administrators and organize partisan political activities on campus that run directly counter to the institution's stated goals of neutrality.

135.    On January 21, 2025 — just one week after the incident with Mr. Rupp — the School's Office of Diversity, Equity, and Inclusion ("DEI") sent an email inviting the community to a "Post-Inauguration Open Processing Space," explicitly promising to provide a "neutral and safe space for processing and sharing of thoughts and feelings."

136.    Professor Farley immediately sent a reply to the entire faculty, staff, and student body, directly rejecting the administration's goal of neutrality. He wrote: "Perhaps you're looking for solidarity instead of neutrality?" He then invited community members to join him to share "anti-fascist ideas and strategies with other pro-democracy partisans," and concluded his email with a quote from political philosopher Frantz Fanon: "Every spectator is either a coward or a traitor."

137.    This email demonstrates Professor Farley's extreme political bias, his contempt for institutional neutrality, and his militant, race-based, absolutist worldview that creates a hostile environment for any student who does not share his partisan beliefs.

138.    Albany Law School's failure to address this public and divisive email, sent to the entire School community, is yet another example of its complete capitulation to Professor Farley, allowing him to operate by a separate set of rules and foster the very environment that led to the abusive treatment of Mr. Rupp.

**The School's Tolerance of Professor Farley's Public, Racially Abusive Attack**

139.    Albany Law School's pattern of acquiescing to Professor Farley's misconduct has also included its tolerance of his public dissemination of racially charged and demeaning attacks directed at Mr. Rupp himself. Despite having actual or constructive knowledge that Professor Farley publicly ridiculed and stereotyped Plaintiff using racialized language following the January 13, 2025 classroom incident, Albany Law School did not investigate the conduct, did not discipline Professor Farley, did not instruct him to retract or remove his statements, and did not take any corrective or remedial action.

140.    On or about January 13, 2025, Professor Farley authored and published a Facebook post concerning Plaintiff Rupp and disseminated it to an audience of approximately 6,100 users. In that post, Professor Farley publicly ridiculed Plaintiff Rupp along racial lines, labeled him with racial and political stereotypes, characterized him as having an "incel / MAGA look," wearing "Daniel Boone clothes" and a "'Remember the Alamo!' hat", and suggested that, "maybe, in addition to racism, there are other illnesses in his head."

141.    The post was not limited to classroom management or academic commentary. Rather, it constituted a public, demeaning attack on an identifiable student using

40

racialized dog-whistle language, broadcast to thousands of followers, and wholly unrelated to any legitimate pedagogical purpose.

142.    At the time it was published, Professor Farley's Facebook post was publicly accessible and widely disseminated, including to individuals affiliated with Albany Law School. Multiple faculty members and administrators including, Professor Keith Hirokawa — the Chair of Mr. Rupp's disciplinary panel — and his partner, Albany Law School Dean Cinnamon Carlarne — were Facebook friends of Professor Farley and access to or observed the post and were aware that it concerned Mr. Rupp, a current student and thus had actual notice that Professor Farley had publicly attacked Mr. Rupp using racialized rhetoric.

143.    Despite this knowledge, no administrator or faculty member rebuked Professor Farley, instructed him to remove the post, characterized the post as inappropriate, or took any disciplinary or corrective action. The School did not investigate the incident or otherwise intervene on Mr. Rupp's behalf.

144.    The School's failure to respond to Professor Farley's public, racialized attack on Mr. Rupp communicated institutional approval and ratification of his conduct, contributed to a hostile educational environment, and further demonstrates the School's deliberate indifference to racially discriminatory conduct when it is committed by Professor Farley.

145.    This well-established pattern of conduct demonstrates that the School's refusal to investigate Mr. Rupp's complaint against Professor Farley, while simultaneously pursuing and escalating Professor Farley's retaliatory complaint against Mr. Rupp, was a deliberate choice motivated by Plaintiff's race and consistent with the School's practice of responding differently when the accused is white versus when the accused is non-white.

146.    It was an action rooted in the School's fear of Professor Farley and consistent with its de facto policy of placating him at the expense of its students and other faculty members, in clear violation of its duties under the law and its own rules and policies.

147.    The sham process deployed against Mr. Rupp is the direct and predictable result of this institutional failure.

## FIRST CAUSE OF ACTION

**Violation of Title VI of the Civil Rights Act of 1964
Against Defendant Albany Law School**

### A. Hostile Educational Environment

148.    Mr. Rupp re-alleges and incorporates by reference all preceding paragraphs.

149.    Albany Law School is a recipient of federal financial assistance and is prohibited by Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., from discriminating on the basis of race, color, or national origin in its programs and activities.

150.    Defendant, acting under color of its authority, intentionally subjected Mr. Rupp, who is white, to discrimination on the basis of his race.

151.    Professor Farley's January 13, 2025 in-class diatribe was not merely political or ideological; it was explicitly framed in racial terms. His statements that "a conservative wants to conserve the past, so they want to conserve slavery," and that conservatives hate black people, were directed at white students as a group. His pejorative labeling of Mr. Rupp as a "Daniel Boone" type based on his attire was not directed at a political ideology in the abstract, but at Mr. Rupp as a white student whom Professor Farley stereotyped, profiled, and ridiculed in front of his peers.

152.    Professor Farley continued his harassing and discriminatory treatment of Mr. Rupp with his Facebook message later that same day.  In that post, Professor Farley again ridiculed Plaintiff Rupp, labeled him with racial and political stereotypes, and publicly accused him of racism and mental illness.

153.    Thereafter, Professor Farley maliciously and falsely accused Mr. Rupp of "racist assault" and "racist and disruptive white behavior" in connection with the retaliatory student discipline charge that he had initiated.

154.    This conduct was severe, pervasive, and objectively offensive, and it interfered with Mr. Rupp's ability to participate in and benefit from Albany Law School's educational program. It created an environment in which white students — particularly white conservative students — were subjected to racial hostility, humiliation, and intimidation unrelated to any legitimate pedagogical purpose.

155.    The racially hostile environment to which Mr. Rupp was subjected was not an isolated occurrence. As alleged above, Professor Farley had engaged in similar racially charged classroom conduct for years prior to January 2025, including sweeping racial generalizations and racially coded mockery of white students. This pattern was well known to Albany Law School administrators and faculty.

156.    Despite actual knowledge of Professor Farley's racially charged classroom conduct and its impact on students, Albany Law School failed to take reasonable corrective action. The School continued to permit Professor Farley to teach without discipline, oversight, or remediation, thereby endorsing and perpetuating the racially hostile educational environment.

157.    Albany Law School's deliberate indifference to this known racial harassment constitutes intentional discrimination under Title VI.

158.    As a direct and proximate result of Defendant's creation and tolerance of a racially hostile educational environment, Mr. Rupp was denied the full benefits of the School's educational program and suffered significant harm.

159.    That harm includes, but is not limited to, Mr. Rupp's forced withdrawal from the International Children's Rights course; disruption of his academic schedule and progress toward his degree; severe emotional distress and anxiety; and reputational injury.

**B. Racially Discriminatory Discipline and Racial Scapegoating**

160.    Albany Law School's discrimination against Plaintiff did not end with its tolerance of a racially hostile classroom environment. After Plaintiff, a white student, challenged and complained about the conduct of a black professor, the School deliberately reframed Plaintiff's conduct in racial terms and subjected him to a form of racially discriminatory discipline.

161.    Although Plaintiff initially complained of being singled out, mocked, and demeaned based on his appearance, political beliefs, and perceived identity, Albany Law School did not treat his complaint as a legitimate grievance. Instead, once Professor Farley accused Plaintiff of racism, the School adopted that accusation and reframed Plaintiff — not the professor — as the racial offender.

162.    On February 2, 2025, while the disciplinary process was ongoing, Professor Farley sent a written communication to Dean Taranto, copying senior administrators including Dean Carlarne, in which he explicitly framed the matter in racial terms. In that communication, Professor Farley asserted that he was "not aware of a single significant instance in which [Albany Law School] hasn't ended up supporting racist and disruptive white behavior," and cited Professor Michael Hutter's "still-unchecked behavior" as an example. Professor Farley

further stated, "This is Albany Law School's mess to fix." Taken together, these statements demonstrate that Professor Farley was not merely offering commentary, but was pressing the administration to adopt a racialized interpretation of Plaintiff's conduct and to address the matter under that framing rather than evaluate it under neutral, race-blind standards.

163.    From that point forward, senior administrators, including Dean Carlarne, permitted the disciplinary process to proceed under a racialized framing advanced by Professor Farley. The School embraced Professor Farley's narrative that Plaintiff's conduct constituted a "racist assault," solicited input from racially affiliated student organizations and DEI personnel, and allowed racialized language and advocacy to shape the investigation and adjudication — measures that would not have been applied to a similarly situated non-white student.

164.    This was not a neutral application of School rules; it was instead a race-based response to the perceived impropriety of a white student challenging a black professor. As the School's treatment of faculty comparators demonstrates, Albany Law School has an established practice of responding to challenges to Professor Farley by white students or faculty by recasting those challengers as racists and either punishing them or failing to protect them accordingly.

165.    By transforming Plaintiff's complaint into a racial transgression and subjecting him to a racially charged and selective disciplinary process, Albany Law School intentionally discriminated against Plaintiff on the basis of race, in violation of Title VI.

## SECOND CAUSE OF ACTION

### Violation of Title VI of the Civil Rights Act of 1964 – Retaliation

**Against Defendant Albany Law School**

166.    Mr. Rupp re-alleges and incorporates by reference all preceding paragraphs.

167.    Title VI and its implementing regulations prohibit retaliation against any individual who has complained of or opposed a practice prohibited by the statute.

168.    Plaintiff, who is white, was singled out and demeaned because of his race, as evidenced by Professor Farley's specific statements that "Conservatives hate everyone – blacks, women, gays" and that a "conservative wants to conserve the past, so they want to conserve slavery," and the School's subsequent race-based reframing of the incident as a "racist assault."

169.    On January 14, 2025, Mr. Rupp engaged in a protected activity under Title VI when he met with Dean Queenan and formally complained about Professor Farley's harassing and discriminatory conduct in the classroom.

170.    Defendant was aware of Mr. Rupp's protected activity. Upon information and belief, however, Professor Farley was notified of Mr. Rupp's complaint shortly after it was made, prompting him to bring a retaliatory charge.

171.    After and as a direct result of Mr. Rupp's protected activity, Defendant took a series of materially adverse actions against him. These retaliatory actions include, but are not limited to:

a.  Refusing to investigate Mr. Rupp's first-in-time complaint of racial discrimination while simultaneously and aggressively pursuing Professor Farley's retaliatory counter-complaint.

b.  Allowing the disciplinary charges against Mr. Rupp to be secretly escalated from a benign classroom disruption into a baseless charge of a violent and racist assault.

c.  Subjecting Mr. Rupp to a sham disciplinary process tainted by improper influence from the very subject of his complaint, Professor Farley, and his affiliates.

d.  Threatening Mr. Rupp with severe academic sanctions, including suspension or expulsion, based on the outcome of this tainted and retaliatory process.

172.    A clear causal connection exists between Mr. Rupp's protected activity and the Defendant's adverse actions. The timing of the events — namely, the filing of Professor Farley's complaint shortly after Mr. Rupp's meeting with Dean Queenan, and the subsequent escalation of the investigation against Mr. Rupp — demonstrates a clear retaliatory motive and, given the absence of any legitimate, non-discriminatory reason for escalating the charges, supports the inference that the adverse actions were taken because Plaintiff engaged in protected activity.

173.    As a direct and proximate result of Defendant's unlawful retaliation, Mr. Rupp has suffered and will continue to suffer significant damages, including emotional distress, reputational harm, and the potential loss of his legal education and career.

## THIRD CAUSE OF ACTION

### Violation of 42 U.S.C. § 1981 – Denial of Equal Rights Under the Law Against Defendant Albany Law School

#### A.  Hostile Educational Environment Impairing Contractual Rights

172.    Mr. Rupp re-alleges and incorporates by reference all preceding paragraphs.

173.    By enrolling at Albany Law School and paying tuition, Mr. Rupp entered into a contractual relationship with Defendant for the provision of educational services.

174.    Implicit in that contractual relationship was Mr. Rupp's right to participate in Albany Law School's educational programs, including classroom instruction, in an

environment free from racially hostile, humiliating, and demeaning conduct by the School's professors.

175.    This contractual relationship is protected by 42 U.S.C. § 1981, which guarantees all persons the same right to make and enforce contracts as is enjoyed by white citizens, regardless of race.

176.    Defendant Albany Law School, acting through its agents and employees, breached and impaired Mr. Rupp's contractual rights by subjecting him to a racially hostile classroom environment. As alleged above, Professor Farley engaged in racially charged classroom conduct, including sweeping racial generalizations and individualized, racially coded mockery directed at Mr. Rupp as a white student, which altered the terms and conditions of Mr. Rupp's educational experience.  He repeated this behavior in writing on a social media page followed by Albany Law School faculty and administrators, including Albany Law School Dean Cinnamon Carlarne.

177.    Professor Farley's conduct was severe, pervasive, and objectively offensive, and it interfered with Mr. Rupp's ability to participate fully in and benefit from the School's educational program. The conduct was not tied to legitimate pedagogical objectives and instead functioned to demean and stigmatize Mr. Rupp on the basis of race.

178.    The racially hostile educational environment to which Mr. Rupp was subjected was not an isolated incident. As alleged above, Professor Farley had engaged in similar racially charged classroom conduct for years, and that conduct was known to Albany Law School administrators and faculty.

179.    Despite actual knowledge of Professor Farley's racially hostile in- and out-of-classroom conduct, Albany Law School failed to take reasonable corrective action and

continued to permit him to teach without discipline, oversight, or remediation, thereby endorsing and perpetuating the hostile environment.

180.    By creating and tolerating a racially hostile educational environment, Defendant intentionally impaired Mr. Rupp's contractual right to receive educational services on equal terms, in violation of 42 U.S.C. § 1981.

**B. Race-Based Impairment of Contractual Rights Through Racialized Discipline**

181.    Defendant's conduct also violated 42 U.S.C. § 1981 by impairing Plaintiff's contractual right to receive educational services on equal terms. After Plaintiff, a white student, exercised his contractual right to complain about mistreatment by a professor, Albany Law School deliberately reframed that complaint in racial terms and subjected Plaintiff to a racially discriminatory disciplinary process.

182.    On February 2, 2025, while the disciplinary process was ongoing, Professor Farley sent a written communication to Dean Taranto, copying senior administrators including Dean Carlarne, in which he explicitly framed the matter in racial terms. In that communication, Professor Farley asserted that he was "not aware of a single significant instance in which [Albany Law School] hasn't ended up supporting racist and disruptive white behavior," and cited Professor Michael Hutter's "still-unchecked behavior" as an example. Professor Farley further stated, "This is Albany Law School's mess to fix." Taken together, these statements demonstrate that Professor Farley was not merely offering commentary, but was pressing the administration to adopt a racialized interpretation of Plaintiff's conduct and to address the matter under that framing rather than evaluate it under neutral, race-blind standards.

183.    From that point forward, senior administrators, including Dean Carlarne, permitted the disciplinary process to proceed under the racialized framing advanced by Professor

Farley. The School embraced Professor Farley's narrative that Plaintiff's conduct constituted a "racist assault," solicited input from racially affiliated student organizations and DEI personnel, and allowed racialized language and advocacy to shape the investigation and adjudication — measures that would not have been applied to a similarly situated non-white student.

184.    Rather than adjudicating Plaintiff's conduct under neutral, race-blind disciplinary standards, Defendant adopted a race-based theory of misconduct and selectively escalated the charges against Plaintiff, thereby denying him a fair and impartial adjudication and impairing the contractual protections promised under the Student Handbook.

185.    The School's actions were not merely retaliatory. They constituted intentional race discrimination because Plaintiff was disciplined, stigmatized, and deprived of contractual protections in a manner that a non-white student would not have been subjected to under similar circumstances. Defendant's own conduct demonstrates that Plaintiff's race was a motivating and determinative factor in how his complaint was received, reframed, and punished.

186.    By denying Plaintiff the same contractual right to fair process and equal treatment afforded to non-white students, Albany Law School violated § 1981's guarantee of equal rights under the law.

## FOURTH CAUSE OF ACTION

### Violation of 42 U.S.C. § 1981 – Retaliation
### Against Defendant Albany Law School

181.    Mr. Rupp re-alleges and incorporates by reference all preceding paragraphs.

182. Section 1981 prohibits retaliation against an individual for complaining about or opposing conduct that violates the statute's guarantee of the right to make and enforce contracts free from racial discrimination.

183. Mr. Rupp engaged in a protected activity under § 1981 when he complained to Dean Queenan about Professor Farley's racially discriminatory conduct, which interfered with his contractual right to receive an education from Albany Law School under the same terms as non-white students.

184. Defendant was aware of Mr. Rupp's protected activity.

185. After Mr. Rupp engaged in this protected activity, Defendant took materially adverse actions against him in retaliation. These actions were designed to punish Mr. Rupp for challenging and objecting to the racially hostile environment and included:

   a. The complete failure to investigate his complaint while aggressively pursuing Professor Farley's counter-complaint.

   b. The bad-faith escalation of the charges against him into a sham proceeding focused on fabricated claims of a racist assault.

   c. The imposition of a biased and procedurally flawed disciplinary process intended to reach a pre-ordained conclusion of guilt.

190. The causal connection between Mr. Rupp's complaint and Defendant's retaliatory conduct is unmistakable. The temporal proximity of the adverse actions, coupled with the selective and disparate enforcement of the School's own rules, demonstrates that Defendant's actions were motivated by a desire to punish Mr. Rupp for challenging Professor Farley's racially discriminatory behavior.

191. As a direct and proximate result of Defendant's unlawful retaliation, Mr. Rupp has suffered and will continue to suffer significant damages, including emotional

distress, reputational harm, and the potential loss of his legal education and career.

## FIFTH CAUSE OF ACTION

**Breach of Contract (Violation of Chapter X of the Albany Law School Student Handbook) Against Defendant Albany Law School**

192.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

193.    At all relevant times, Plaintiff and Defendant were in a contractual relationship whereby Plaintiff paid tuition and otherwise fulfilled all obligations required for enrollment at Albany Law School, and Defendant agreed to provide educational services in accordance with the terms, promises, and procedures set forth in its Student Handbook, including Chapter X governing disciplinary proceedings.

194.    The provisions of Chapter X, along with related policies published by Defendant, constitute binding contractual terms between the parties. Those terms guarantee, among other things, that any student disciplinary process will be conducted confidentially and without disclosure to non-participants; by neutral and independent decision-makers free from outside influence; pursuant to written notice, stable charges, and basic procedural fairness; and in a manner consistent with Defendant's own published standards and applicable federal law.

195.    Defendant breached these express and implied contractual promises in multiple respects. Defendant disclosed the existence and details of Plaintiff's confidential disciplinary proceeding to individuals and entities with no legitimate educational interest, including the Black Law Students Association, Assistant Dean Jermaine Cruz, and other administrators and students not authorized under Chapter X. Defendant further permitted those

outside individuals to influence and participate in the investigation and adjudication of the charges, thereby undermining neutrality and confidentiality.

196.    Defendant also allowed the appointed Reporter, Professor Vincent Bonventre, to abandon his role as a neutral factfinder by issuing premature findings of misconduct, employing an evidentiary standard reserved for the adjudicative panel, and failing to maintain independence from improper influence. In addition, Defendant failed to obtain or enforce the required commitment to confidentiality from the Reporter, and altered and expanded the charges against Plaintiff without notice or formal amendment, depriving Plaintiff of fair process and the opportunity to defend against stable allegations.

197.    These breaches not only violated Defendant's contractual promises but also deviated from the standard of care embodied in the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, which reflects the federal policy requiring institutions receiving federal funds to safeguard the confidentiality of student education records and to limit access to those with a legitimate educational interest.

198.    Although FERPA does not provide a private right of action, its statutory and regulatory standards inform the reasonable expectations of privacy, confidentiality, and procedural integrity incorporated into Defendant's contractual duties under Chapter X. Defendant's repeated and willful disregard of those standards, its disclosure of Plaintiff's confidential records, and its politicization of what was supposed to be a private disciplinary process, therefore constitute a material breach of contract.

199.    As a direct and proximate result of Defendant's breaches, Plaintiff has suffered and continues to suffer substantial harm, including loss of educational opportunity through disruption of his academic progression and exposure to potential suspension; severe

emotional distress, reputational injury, and humiliation; and financial losses, including tuition, costs, and legal fees.

### SIXTH CAUSE OF ACTION

**Negligent Supervision and Retention
Against Defendant Albany Law School**

200.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

201.    At all relevant times, Defendant Albany Law School employed Professor Anthony Farley as a tenured faculty member and instructor.

202.    Defendant owed a duty to exercise reasonable care in supervising, monitoring, and retaining its faculty to ensure that students were not subjected to discriminatory, abusive, or defamatory conduct.

203.    Defendant knew, or in the exercise of reasonable care should have known, that Professor Farley had a long-standing history of racially charged, unprofessional, and abusive behavior toward students and colleagues, including repeated episodes of racial hostility toward white and conservative students and verbal attacks directed against white faculty members.

204.    Despite this actual and constructive knowledge, Defendant failed to take any meaningful corrective or disciplinary action. Instead, it continued to assign Professor Farley to mandatory and elective courses, permitted him to serve as faculty advisor to student organizations, and allowed him to represent the institution publicly, thereby endangering students and staff.

205.    Defendant's failure to act was motivated in part by fear of internal conflict and by its unwillingness to confront or discipline a tenured faculty member whose misconduct

was well known, thereby demonstrating reckless disregard for the safety and well-being of its students.

206.    As a direct and proximate result of Defendant's negligent supervision and retention, Plaintiff suffered the injuries described herein, including emotional distress, reputational harm, academic disruption, and economic losses.

207.    Defendant's conduct was willful, wanton, and in reckless disregard of Plaintiff's rights, warranting the imposition of punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Rowland A. Rupp IV respectfully requests that this Court enter judgment in his favor and against Defendant Albany Law School, and grant the following relief:

a.  A declaration that Defendant's conduct violated Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., and 42 U.S.C. § 1981, and constituted unlawful race discrimination and retaliation;

b.  A declaration that Defendant breached its contractual obligations to Plaintiff under the Albany Law School Student Handbook, including Chapter X governing disciplinary proceedings, and violated its duty to provide a fair, confidential, and non-discriminatory disciplinary process;

c.  An award of compensatory damages in an amount to be determined at trial for Plaintiff's emotional distress, pain and suffering, humiliation, reputational injury, and loss of educational opportunity;

d.  An award of economic damages, including but not limited to tuition paid, educational expenses, and additional costs incurred as a result of Defendant's conduct, and any other out-of-pocket losses proven at trial;

e.  An award of punitive damages to the extent permitted by law, including under 42 U.S.C. § 1981 and New York law, to punish Defendant for its willful, malicious, and reckless disregard of Plaintiff's federally protected and contractual rights and to deter similar misconduct;

f.    An award of attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988, applicable state law, and any other governing authority; and

g.    Such other and further legal or equitable relief as the Court deems just and proper.

### **JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38, Plaintiff demands trial by jury for all issues so

triable.

Dated: January 7, 2026
Buffalo, New York

**RUPP PFALZGRAF LLC**
Attorneys for Plaintiff, Rowland A. Rupp

By: _____
        Marco Cercone
1600 Liberty Building
424 Main Street
Buffalo, New York 14202
(716) 854-3400